UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

NML CAPITAL, LTD.,                             :
                                               :        08 Civ. 6978 (TPG)
                          Plaintiff,           :        09 Civ. 1707 (TPG)
                                               :        09 Civ. 1708 (TPG)
                 v.                            :
                                               :
THE REPUBLIC OF ARGENTINA,                     :
                                               :
                          Defendant.           :

------------------------------------------------------- x
                                               :
AURELIUS CAPITAL MASTER, LTD. and              :
ACP MASTER, LTD.,                              :        09 Civ. 8757 (TPG)
                                               :        09 Civ. 10620 (TPG)
                          Plaintiffs,          :
                                               :
                 v.                            :
                                               :
THE REPUBLIC OF ARGENTINA,                     :
                                               :
                          Defendant.           :
                                               :

------------------------------------------------------- x
                                               :
AURELIUS OPPORTUNITIES FUND II, LLC            :
and AURELIUS CAPITAL MASTER, LTD.,             :        10 Civ. 1602 (TPG)
                                               :        10 Civ. 3507 (TPG)
                          Plaintiffs,          :
                                               :
                 v.                            :
                                               :
THE REPUBLIC OF ARGENTINA,                     :
                                               :
                          Defendant.           :
                                               :        **(captions continued on next page)**

------------------------------------------------------- x

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE EURO BONDHOLDERS' EMERGENCY MOTION FOR STAY

```
------------------------------------------------------- x
AURELIUS CAPITAL MASTER, LTD. and           :
AURELIUS OPPORTUNITIES FUND II, LLC,        :        10 Civ. 3970 (TPG)
                                            :        10 Civ. 8339 (TPG)
                        Plaintiffs,         :
                                            :
               v.                           :
                                            :
THE REPUBLIC OF ARGENTINA,                  :
                                            :
                        Defendant.          :
------------------------------------------------------- x
BLUE ANGEL CAPITAL I LLC,                   :
                                            :
                        Plaintiff,          :        10 Civ. 4101 (TPG)
                                            :        10 Civ. 4782 (TPG)
               v.                           :
                                            :
THE REPUBLIC OF ARGENTINA,                  :
                                            :
                        Defendant.          :
------------------------------------------------------- x
OLIFANT FUND, LTD.,                         :
                                            :
                        Plaintiff,          :        10 Civ. 9587 (TPG)
                                            :
               v.                           :
                                            :
THE REPUBLIC OF ARGENTINA,                  :
                                            :
                        Defendant.          :
------------------------------------------------------- x
PABLO ALBERTO VARELA, et al.,               :
                                            :
                        Plaintiff,          :        10 Civ. 5338 (TPG)
                                            :
               v.                           :
                                            :
THE REPUBLIC OF ARGENTINA,                  :
                                            :
                        Defendant.          :
------------------------------------------------------- x
```

## <u>**TABLE OF CONTENTS**</u>

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 3

ARGUMENT ....................................................................................................... 7

I.       THE EURO BONDHOLDERS LACK STANDING TO SEEK A STAY ......................... 7

II.      THE MOTION FOR A STAY FAILS ON THE MERITS ................................... 8

         A.      Argentina And Its Allies Definitively Lost On The Merits And Therefore
                 Cannot Succeed On The Merits ................................................................. 8

         B.      A Final Remedy Cannot Constitute Irreparable Harm, And, In Any Event,
                 The RUFO Clause Does Not Bar Argentina From Paying Plaintiffs Or
                 Negotiating For Other Relief ..................................................................... 9

         C.      A Stay Would Injure The Plaintiffs By Undermining And Potentially
                 Destroying The Injunctions .................................................................... 12

                 1.      A Stay Would Invite Argentina To Carry Out Its Long-Threatened
                         Evasion Scheme And Thus To Destroy Any Effect The Injunctions
                         Might Have Had ......................................................................... 13

                 2.      Each Exchange Bond Payment Without A Corresponding Payment
                         To Plaintiffs Tramples Plaintiffs' Right To Equal Treatment .................. 14

         D.      Indulging Any Litigant That Repeatedly Has Flouted The Court's
                 Authority Is Not In The Public Interest ................................................... 16

CONCLUSION................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allied Bank Int'l v. Banco Credito Agricola de Cartago*,
 757 F.2d 516 (2d Cir. 1985) ........................................................... 17, 18

*Antonio-Martinez v. INS*,
 317 F.3d 1089 (9th Cir. 2003) ........................................................... 18

*Greene Cnty. Planning Bd. v. Fed. Power Comm'n*,
 490 F.2d 256 (2d Cir. 1973) ........................................................... 9

*Hirschfeld v. Bd. of Elections*,
 984 F.2d 35 (2d Cir. 1993) ........................................................... 12

*In re Bernard L. Madoff Inv. Sec. LLC.*,
 721 F.3d 54 (2d Cir. 2013) ........................................................... 7

*Motorola Credit Corp. v. Uzan*,
 561 F.3d 123 (2d Cir. 2009) ........................................................... 16, 17, 18

*New York News, Inc. v. Kheel*,
 972 F.2d 482 (2d Cir. 1992) ........................................................... 7

*Nken v. Holder*,
 556 U.S. 418 (2009)........................................................... 8

*NML Capital, Ltd. v. Republic of Argentina*,
 727 F.3d 230 (2d Cir. 2013) ........................................................... 6, 7, 12, 13

*Ofosu v. McElroy*,
 98 F.3d 694 (2d Cir. 1996) ........................................................... 16

*Reading & Bates Petroleum Co. v. Musslewhite*,
 14 F.3d 271 (5th Cir. 1994) ........................................................... 15

*Signal Capital Corp. v. Frank*,
 895 F. Supp. 62 (S.D.N.Y. 1995) ........................................................... 14

*United States v. Swift & Co.*,
 286 U.S. 106 (1932)........................................................... 9

*Weltover, Inc. v. Republic of Argentina*,
 941 F.2d 145 (2d Cir. 1991), aff'd, 504 U.S. 607 (1992)........................................................... 17

**Statutes and Rules**

Fed. R. Civ. P. 60(b) ................................................................................................................ 8

**Other Authorities**

Anna Gelpern, *Argentina: The RUFO Crazy*, Credit Slips (July 23, 2014, 1:26 AM),
    http://www.creditslips.org ......................................................................................... 10

Joseph Cotterill, *The RUFO Persecution Complex*, Financial Times Alphaville (July 22, 2014,
    11:55 AM), http://ftalphaville.ft.com ........................................................................ 10

## **INTRODUCTION**

This litigation ended on June 16, 2014, when the Supreme Court denied Argentina's final certiorari petition challenging these Injunctions.  In the 43 days since, Argentina and its allies have repeatedly blamed everyone else—the plaintiffs, this Court, the Supreme Court, and Congress, among others—for problems that are decidedly of Argentina's own making, and which Argentina and the Exchange Bondholders (including the movant Euro Bondholders) have spent the past two-plus years denying, ignoring, or exacerbating.  Enough is enough.

The Euro Bondholders cannot take another bite at the apple where Argentina has failed— much less by manufacturing an emergency with a thirteenth-hour filing.  The Second Circuit has held that the Euro Bondholders lack standing in this case because the Injunctions directly bind Argentina, not the Euro Bondholders.  That ruling is indisputably the law of this case.  And it is a constitutional axiom that this Court cannot act on any motion by a party that lacks standing— particularly one that would, like this stay motion, eviscerate years of litigation between the parties.  This Court therefore lacks the power to do anything other than deny the Euro Bondholders' motion for lack of standing.  This so-called "emergency" should end there.

Apart from the lack of standing, the Euro Bondholders' claim that the "RUFO" (Rights Upon Future Offers) clause prohibits settlement is illusory.  That clause plainly applies only to offers by Argentina to "purchase or exchange" (or "consents to amend").  A settlement is neither of those things—indeed, Argentina's own Prospectus Supplement says so, which is why Argentina never even mentioned RUFO until its *post*-argument brief in the *second* appeal to the Second Circuit.  What is more, Argentina has done nothing since certiorari was denied on June 16 to deal with the RUFO issue that is supposedly an obstacle to resolving these cases.  Nor have the Euro Bondholders taken meaningful action, despite actively litigating against the plaintiffs

for the past two years, to waive their supposed RUFO rights.  Indeed, they waited until the last conceivable instant to seek this stay and make this supposed "offer" to address RUFO concerns, attempting to manufacture an emergency.  Thus, the arguments about the RUFO clause are a ruse to avoid Argentina's legal obligations—nothing more, nothing less.

Finally, the Euro Bondholders decry—once again—the potential consequences of the Injunctions.[1]  But the Euro Bondholders, along with Argentina and its other *amici*, have litigated those very same concerns up through the Second Circuit (twice) and the Supreme Court (twice) and lost every time.  Those purported harms cannot now stand in the way of the relief that this Court and others have spent years crafting and litigating.  As this Court stated a week ago, "we have had years of background, but now we are at a very . . . crucial time.  We have arrived there."  Ex. A (July 22, 2014 transcript) at 48:3-5.[2]

The motion should be denied for another reason as well:  The "stay" it seeks is not a stay at all but rather a Trojan horse that would potentially undo the Injunctions.  While the Euro Bondholders blithely assert that a stay would not prejudice plaintiffs—ridiculously, they claim that no prejudice would accrue *because* plaintiffs have *not* been paid a nickel in the past 13 years—allowing Argentina to defer the choice presented by the Injunctions would undermine and potentially destroy these indisputably valid and final judicial orders.  A stay of even a few *hours* would provide Argentina the opportunity to nullify the Injunctions' effects for many

---

[1]  To be clear—and contrary to the Euro Bondholders' implicit assertions—the consequences of Argentina's default will not descend instantaneously at 12:01 a.m. on July 31, although that is when an "Event of Default" will occur under the bond contracts.  For the Exchange Bonds on which the payment is currently due, acceleration of principal is not triggered unless and until written notice from holders of "at least 25% in aggregate principal amount" is actually received by the Trustee.  Indenture § 4.2.  And cross-defaults in other series of bonds are cured if Argentina cures the original violation "within 60 days."  *Id.*

[2]  Citations to "Ex. __" refer to exhibits to the Declaration of Eric J. Finkelstein in support of this Opposition, filed herewith.

months, by making *advance* payments to the Exchange Bondholders—and Argentina has begun preparations to do exactly that.  Such a lengthy reprieve would likely nullify the Injunctions forever:  Given sufficient time, Argentina could develop a way to pay the Exchange Bondholders outside the reach of the U.S. courts, as its President and Economy Minister have repeatedly vowed to do.  Any promises Argentina may make to the contrary are empty—in its bid for certiorari, Argentina promised the Supreme Court that it would comply with the Injunctions, but when certiorari was denied Argentina promptly announced a prohibited evasion plan and then further *violated the Injunctions by trying to pay the Exchange Bondholders* without paying the plaintiffs.  (For good measure, Argentina took out full-page ads in leading American and Argentine newspapers trumpeting the supposed virtue of its actions in violation of the Injunctions, and blaming this Court and the plaintiffs for the supposed vice of enforcing the Injunctions.)

Argentina and its allies, including the Euro Bondholders, successfully deferred this moment of reckoning while they exhausted every conceivable option available to them, but there is no legal or equitable basis for further delay.  The Euro Bondholders' motion for an emergency stay is meritless and should be denied.

## **BACKGROUND**

After the Supreme Court denied Argentina's petition, all eyes turned to the Exchange Bond payment that was coming due on June 30.  The Injunctions, indisputably in effect, constrained Argentina either (i) to make some or all of the Exchange Bond payment and pay plaintiffs a pro rata portion of the $1.67 billion it owes them on their Original Bonds,[3] or (ii) to

---

[3] "Original Bonds" refers to the bonds plaintiffs own, sometimes also referred to as "FAA Bonds" or "defaulted bonds."  Argentina has not paid anything on the Original Bonds since it defaulted in 2001.

miss the Exchange Bond payment, in which case it need not pay the plaintiffs anything.  By virtue of a 30-day grace period in the Exchange Bond contracts, the payment's effective due date is July 30.

Argentina's first move was to attempt to evade the jurisdiction of the U.S. courts to which it had submitted, belying its promise to the Supreme Court of compliance.  Just hours after the Supreme Court's ruling, President Kirchner again took to the airwaves and declared that Argentina would not "be subjected to such *extortion*."  Message By National Broadcast, From President Cristina Fernández de Kirchner, Ex. C at 5 (Dkt. 529-1) (June 20, 2014) (emphasis added).[4]  She revealed that she had "instructed the Economy Ministry . . . to make available all the instruments . . . necessary for all those who have trusted in Argentina . . . to receive their money."  *Id.*  Lest there have been any doubt about what she meant, Argentina's Economy Minister, Axel Kicillof, issued a press release the next day.  It stated:  "[W]e are initiating steps to carry out a debt exchange *to pay in Argentina under Argentine law*."  Economy Ministry at 1 (Dkt. 529-2) (June 20, 2014) (emphasis added).  This is now a familiar pattern:  Argentina promises it will comply; a court rules against it; Argentina immediately proclaims that it will not comply and announces a plan to violate the anti-evasion orders.

This Court confirmed that Argentina's plans were illegal, but it also actively sought to broker a compromise.  On June 20, the Court issued an order confirming that Minister Kicillof's planned "debt exchange" would "violat[e] the rulings and procedures now in place" and was consequently prohibited.  Order at 1 (Dkt. 527) (June 20, 2014).  The next business day, this Court *sua sponte* appointed a Special Master, Daniel A. Pollack, to assist the parties with possible settlement negotiations.  Order for Appointment of Special Master (Dkt. 530) (June 23,

---

[4]  Citations to "Dkt. __" refer to documents on the docket of *NML Capital, Ltd. v. Republic of Argentina*, No. 1:08-cv-6978 (S.D.N.Y.).

2014).  As this Court explained at a subsequent hearing, "I didn't appoint a Special Master . . . . without being very seriously interested in seeing that there would be settlement negotiations." Ex. B at 24:16-18.

On the day this Court appointed the Special Master, Argentina filed a two-page letter requesting a stay.  Letter (Dkt. 531) (June 23, 2014).  Its purported rationale for such relief was limited to a single paragraph.  *Id.* at 2.  First, it said that Argentina lacked the wherewithal to pay *all* Original Bonds outstanding—even though the Injunctions cover only a fraction of the Original Bonds.  Second, and separately, it said that Argentina could not ignore the "RUFO" clause—even though Argentina did not discuss the limited scope of that clause or explain how paying plaintiffs what they are owed in response to a court order could possibly trigger it.  And, third, it said that Argentina, "as a sovereign nation," is "subject to its own Constitutional processes" (*id.*)—even though Argentina's sovereignty had been the crux of the argument that this Court, the Second Circuit, and the Supreme Court had repeatedly rejected.  On June 26, this Court denied Argentina's request.  Order (Dkt. 533) (June 26, 2014).  It urged the parties to engage in negotiations with the Special Master if they wished to agree to conditions that would suspend enforcement of the Injunctions before the July 30 deadline.  Ex. B at 20, 22.

Minutes before this Court entered its order on Argentina's request, however, *Argentina blatantly violated the Injunctions*.  It paid $832 million—the amount owed on its June 30 Exchange Bond payment—to the banks that customarily process Exchange Bond payments. Official Press Release from the Argentine Government at 1 (Dkt. 542 Ex. C) (June 27, 2014). And it made no pretense of paying the plaintiffs, or of seeking this Court's prior approval for the payment as required by the Injunctions.  The next day, this Court held a hearing and confirmed that Argentina's attempted payment was illegal.  Ex. B at 23.  Those banks did not forward the

payments, because further processing the payment would have subjected the banks to the risk of contempt under Federal Rule of Civil Procedure 65(d)(2)(C). *See NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 238 (2d Cir. 2013) ("*NML II*").

Not content with flouting the Injunctions, Argentina also went out of its way to condemn this Nation's judiciary—and this Court by name. Argentina declared that the payment was a "*warning to the United States* regarding the consequences of its acts, given the international responsibility it bears for the decisions taken by its judicial branch . . . and to Judge Thomas Griesa himself, with regard to future court actions that may allow us to legitimately enforce our rights as members of the international community" in various international tribunals. Official Press Release from the Argentine Government at 2 (Dkt. 542 Ex. C) (June 27, 2014). In other words, it threatened to sue this Court and, indeed, the whole country. Economy Minister Kicillof has separately proclaimed that the Injunctions, twice affirmed by the Second Circuit, are "absurd," "nonsense," "crazy," and "extortion." Ex. C at 4, 7. Argentina took out a full-page newspaper advertisement on June 29 accusing this Court of "bias in favour of the vulture funds" and a desire to "bring [Argentina] down to [its] knees before global usurers." Ex. D. And, on July 4, Argentina's Cabinet Chief pronounced that America's "judicial branch . . . is not independent of the vulture funds because its decisions show clear partiality." Ex. E.

On July 21, Argentina took another ominous step, apparently preparing to exploit even the narrowest window that might be opened by a stay request such as this one. Argentina issued statements to the stock exchange regarding its *September* and *December* 2014 Exchange Bond payments—a step that it typically takes just a month before making a payment. Ex. F. As *Reuters* concluded, that unusual move "suggests [Argentina] is preparing to transfer all coupon payments in one fell swoop if [the district court] orders a short stay of" the Injunctions. *Id.*

6

On July 29—over a month after this Court first denied Argentina's request for a stay, and just one day before the next Exchange Bond payment is effectively due—the Euro Bondholders filed this motion for an emergency stay.

## ARGUMENT

### I.   THE EURO BONDHOLDERS LACK STANDING TO SEEK A STAY

As a threshold matter, this Court must deny the Euro Bondholders' motion for lack of standing. The Euro Bondholders sought to intervene in this litigation a year and a half ago, but the Second Circuit held that they lacked standing to do so. *NML II*, 727 F.3d at 240. In particular, it held that the "Euro Bondholders . . . are not bound by the amended injunctions. They are creditors, and, as such, their interests are not plausibly affected by the injunctions because a creditor's interest in getting paid is not cognizably affected by an order for a debtor to pay a different creditor." *Id.* Thus, it is the law of the case that the Euro Bondholders lack standing to secure relief in their own right. They are, at most, *amici* of Argentina. *Id.*

Because the Euro Bondholders lack standing, the Court cannot grant the relief they seek. "Standing is a threshold question in every federal case, determining the power of the court to entertain the suit." *In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 54, 66 (2d Cir. 2013) (quotation marks omitted); *see also New York News, Inc. v. Kheel*, 972 F.2d 482, 488 (2d Cir. 1992) ("[T]he district court properly held that Kheel as a non-party and a non-participant in the action could not move for sanctions unless he satisfied the intervention requirements of Rule 24."). The Euro Bondholders are unable to cross that threshold. This Court must therefore deny their motion.

## II.   THE MOTION FOR A STAY FAILS ON THE MERITS

Even were the Court to consider the Euro Bondholders' motion for a stay, every pertinent legal factor weighs against the motion.  The standard for evaluating a stay application is firmly established: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation and internal quotation marks omitted).  None of these factors even arguably supports a stay.

### A.   Argentina And Its Allies Definitively Lost On The Merits And Therefore Cannot Succeed On The Merits

The point of a stay is usually that the litigant might eventually persuade this Court or an appellate court that the Injunctions were entered in error.  But that cannot happen here.  The Injunctions—twice affirmed by the Second Circuit, with certiorari twice denied by the Supreme Court—are in full effect.  The Injunctions are as final as any order can be.

The only way Argentina or its nonparty *amici* could "succeed on the merits," therefore, is to attack the judgment collaterally under the extraordinarily high standards set forth in Federal Rule of Civil Procedure 60(b).  But they have not done so—they have not moved this Court to modify or set aside the Injunctions under Rule 60(b), much less articulated any basis for satisfying that rule.  Thus, there are no "merits" on which Argentina possibly could succeed.  The law permits a stay pending a valid legal challenge, but not a stay for sheer delay, to reward Argentina's intransigence, or even if one party insists that doing so would assist settlement discussions.  (To be clear, a stay would *frustrate* any possibility of settlement, as Argentina has proven for the past two-plus years by refusing to engage in *any* settlement discussions.)

Even if the Euro Bondholders were openly seeking to change the Injunctions, their arguments provide no basis for doing so. Although Argentina did not profess RUFO concerns in this case until after argument in the second appeal to the Second Circuit, there is no longer anything the least bit new about those complaints or about the effect the Injunctions may have on other Exchange Bondholders or other third parties. Argentina and its *amici* litigated all of this repeatedly—and unsuccessfully—in this Court, the Second Circuit, and the Supreme Court.

To the extent the Euro Bondholders purport to cast their RUFO concerns as "new," those assertions must fail because they are *new arguments* without *new circumstances*. Supposed concerns about the RUFO clause were knowable well before this Court entered the Injunctions in February 2012, not to mention throughout the 29 months of appellate and remand proceedings that followed. Only a "clear showing of grievous wrong evoked by new and unforeseen conditions should lead [the Court] to change what was decreed after years of litigation." *United States v. Swift & Co.*, 286 U.S. 106, 119 (1932). It certainly cannot do so in the course of seeking the "extraordinary remedy" of a stay. *See Greene Cnty. Planning Bd. v. Fed. Power Comm'n*, 490 F.2d 256, 260 (2d Cir. 1973).

> **B.** **A Final Remedy Cannot Constitute Irreparable Harm, And, In Any Event, The RUFO Clause Does Not Bar Argentina From Paying Plaintiffs Or Negotiating For Other Relief**

The "harm" the Euro Bondholders complain of—that Argentina must pay the plaintiffs or suffer the consequences of missing an Exchange Bond payment—is nothing more than the effect of the Injunctions. Argentina is in breach of its obligations, and the courts have entered a final order to remedy that breach. By definition, when a plaintiff wins a lawsuit, the remedy "harms" the defendant in some way—at the end of the day, litigation produces winners and losers. But losing a lawsuit is not "irreparable harm" in any sense relevant to a stay application; the losing party must of course face whatever burdens a final, fully affirmed order may impose.

Argentina thus faces no harm other than the very remedy that this Court and others have prescribed for it.

Moreover, the Injunctions need not visit any "harm" on Argentina. This Court has appointed a Special Master, and the plaintiffs are ready, willing, and able to negotiate a settlement—which could include some sort of delay—even though they have won the case. The Euro Bondholders, however, insist that no such arrangement is possible. That claim is baseless.

The Euro Bondholders principally claim that a settlement cannot be negotiated now because of the "RUFO" clause ("Rights Upon Future Offers") in the Exchange Bonds. That claim is false.[5] There is no plausible reading of the RUFO clause that would prevent Argentina from paying plaintiffs in full or negotiating a settlement. That clause reads as follows:

> [I]f at any time on or prior to December 31, 2014, the Republic voluntarily makes an offer to purchase or exchange (a "Future Exchange Offer"), or solicits consents to amend (a "Future Amendment Process"), any outstanding Non-Performing Securities, each Holder of Securities shall have the right . . . to exchange any of such Holder's Securities for (as applicable):
>
> (i)   the consideration in cash or in kind received by holders of Non-Performing Securities in connection with any such Future Exchange Offer, or
>
> (ii)  debt obligations having terms substantially the same as those resulting from any such Future Amendment Process,
>
> in each case in accordance with the terms and conditions of such Future Exchange Offer or Future Amendment Process.

---

[5]   Commentators agree that the RUFO clause poses little risk to settlement. *See* Joseph Cotterill, *The RUFO Persecution Complex*, Financial Times Alphaville (July 22, 2014, 11:55 AM), http://ftalphaville.ft.com. That is true even for those observers who have consistently sided with Argentina's views on other issues in this litigation. Anna Gelpern, *Argentina: The RUFO Crazy*, Credit Slips (July 23, 2014, 1:26 AM), http://www.creditslips.org.

Ex. G at R-10.[6]  Thus, the RUFO clause applies only if Argentina (i) "voluntarily" offers to "purchase or exchange" any Original Bonds, or (ii) "solicits consents to amend" them.

The Euro Bondholders do not contend—nor could they—that the RUFO clause bars *compliance with the Injunctions*.  Paying the plaintiffs all or some of the $1.67 billion Argentina owes them could not possibly constitute a "purchase," "exchange," or "amendment" of any Original Bonds.  The RUFO clause is relevant only if the parties seek a compromise, and only under the specific conditions set forth in the clause.

Argentina's own bond documents make clear that the RUFO clause would not be implicated by any number of settlement options.  For starters, the Prospectus Supplement that accompanied the Exchange Bonds states that "Argentina reserves the right . . . to purchase, exchange, offer to purchase or exchange, *or enter into a settlement in respect of*" the Original Bonds.  Ex. H at S-60 (emphasis added).  Yet the RUFO clause deals only with a "purchase or exchange"; thus, a purchase or exchange is not a "settlement."  This is Contract Interpretation 101.  Moreover, the Prospectus Supplement goes on to confirm that Exchange Bondholders may be entitled to "participate in any voluntary purchase, exchange, offer to purchase or exchange"— but again, not a settlement.  *Id.*[7]

The RUFO clause aside, the Euro Bondholders argue that the absence of a stay will irreparably harm Exchange Bondholders.  The Second Circuit conclusively rejected this argument, holding that it would be *Argentina*—not the absence of a stay—that would harm the

---

[6]  There are immaterial variations in the RUFO clause across different series of Exchange Bonds.

[7]  There are many more reasons—both legal and practical—why the RUFO "issue" is no barrier to resolution.  To list just a few examples:  Argentina could seek a declaratory judgment regarding the interpretation of the RUFO clause; it could condition a deal on waiver of the RUFO rights by Exchange Bondholders; it could offer to purchase the plaintiffs' legal claims (which the clause does not cover), as opposed to their bonds (which the clause arguably covers).  Yet Argentina insists on holding this gun to its own head.

Exchange Bondholders.  *NML II*, 727 F.3d at 242 ("[H]arm threatened to third parties by a party subject to an injunction who avows not to obey it . . . does not make an otherwise lawful injunction 'inequitable.'  We are unwilling to permit Argentina's threats to punish third parties to dictate the availability or terms of relief under Rule 65.").  In addition, Argentina explicitly warned the Exchange Bondholders about the risk of litigation by holders of Original Bonds in the Exchange Bond documents.  *Id.*  Thus, this alleged harm—inflicted by Argentina and well advertised to Exchange Bondholders—is no reason to stay the Injunctions.[8]

### C.      A Stay Would Injure The Plaintiffs By Undermining And Potentially Destroying The Injunctions

The Euro Bondholders make the preposterous assertion that "[a] stay would not affect plaintiffs at all, since they have not been paid since 2001 and have been litigating this case for many years."  A stay of even a few hours would inflict enormous and likely irreparable prejudice on the plaintiffs.  No matter how brief, a stay would enable Argentina to cram through several more Exchange Bond payments—effectively negating the Injunctions through the end of this year.  Argentina is already making public preparations to do exactly that.  Worse, a stay would give Argentina opportunity to do what it repeatedly has threatened to do: rearrange the payment process on the Exchange Bonds to place it beyond the reach of U.S. courts and permanently nullify the Injunctions.  In any event, a stay would not preserve the status quo, but would deprive plaintiffs of the equal treatment to which they are indisputably entitled.  This Court should not let those harms come to pass.

---

[8] Even if the RUFO clause raised legitimate concerns—and it does not—that the Euro Bondholders waited until the thirteenth-hour to request a stay is reason enough to deny their motion.  *Hirschfeld v. Bd. of Elections*, 984 F.2d 35, 39 (2d Cir. 1993) ("The Board of Elections' inexcusable delay in filing the motions here at issue severely undermines the Board's argument that absent a stay irreparable harm would result.").

      **1.**      **A Stay Would Invite Argentina To Carry Out Its Long-Threatened Evasion Scheme And Thus To Destroy Any Effect The Injunctions Might Have Had**

A stay would likely inflict the ultimate harm: undoing the Injunctions altogether. The Injunctions are effective in the face of Argentina's open defiance of judicial orders because Argentina routes its Exchange Bond payments through the entities subject to jurisdiction of U.S. courts. Any institution that helps Argentina process an illegal Exchange Bond payment would face contempt. *See NML II*, 748 F.3d at 242-43. For that reason, Argentina's oft-touted scheme to reroute Exchange Bond payments through *Argentina*—or any other jurisdiction that intends not to respect U.S. court orders—amounts to a scheme to evade the Injunctions.

Even a modest stay could give Argentina the time it needs to carry out its scheme. While it is difficult to know exactly how Argentina plans to execute this scheme, rerouting the payments may be time-consuming, as it would require identifying financial institutions and sophisticated investors willing to thwart the anti-evasion orders in place. That is why Argentina wants to make all of its 2014 Exchange Bond payments the minute this Court enters a stay—it would get the U.S. courts off of its back for the rest of the year. During that time, Argentina could "initiate a debt exchange that would permit [it] to pay in Argentina under Argentine law," as Economy Minister Kicillof has promised it would. Economy Ministry at 1 (Dkt. 529-2) (June 20, 2014) (emphasis added). To that end, Argentina has issued certain payment notices for the September 30 and December 30 Exchange Bond payments months earlier than it ordinarily would, apparently in the hope that it can make these payments *in advance* if there is even a momentary opportunity to do so.

Conditioning the stay on Argentina's promise not to follow through with its plan is not a serious option. Argentina knows no law but expedience—it has promised (twice) not to try to evade the Injunctions, then announced its intent to do so; it promised the Supreme Court that it

would comply with the Injunctions, then attempted to make an illegal Exchange Bond payment. These are but the most recent and egregious of Argentina's broken promises. Argentina will promise to comply when it sees fit and violate court orders when it sees fit. If it secures a stay effectively through the end of the year, it would be happy to let contempt citations pile up, then make all future Exchange Bond payments beyond this Court's practical reach.

"[A] demonstration of intent to frustrate a judgment will satisfy the requirement of a showing of irreparable harm." *Signal Capital Corp. v. Frank*, 895 F. Supp. 62, 64 (S.D.N.Y. 1995). Here, "demonstration" is an understatement. Argentina has declared repeatedly and from the highest levels that it will do anything it can to thwart the Injunctions. This Court should not let it harm the plaintiffs.

### 2. Each Exchange Bond Payment Without A Corresponding Payment To Plaintiffs Tramples Plaintiffs' Right To Equal Treatment

Argentina owes plaintiffs two things. First, the amounts due on the Original Bonds, now $1.67 billion. Second, it has a distinct obligation to rank its payment obligations on the Original Bonds and the Exchange Bonds *equally*. Argentina's breach of *that* obligation was the injury on which the plaintiffs predicated their claim for equal treatment—and which the Injunctions are designed to remedy. Consequently, a stay would injure the plaintiffs because it would force them to endure still further violations of the Equal Treatment Provision long after plaintiffs' rights under the law have been definitively and finally established. As this Court explained in the context of Argentina's unsuccessful application for a stay: "The problem with the so-called stay application was that it would take away the rights. . . . It really wouldn't be a stay in the sense of holding the status quo." Ex. A at 54:17-20.

The Euro Bondholders' suggestion that the plaintiffs would be paid down the road thus is no answer; equality delayed is equality denied. Moreover, delay itself imposes still further costs

to Plaintiffs here—not least of which are the additional litigation costs Plaintiffs will undoubtedly bear when Argentina and its allies seek yet another stay before the Euro Bondholders' proposed stay expires or make yet another evasion attempt. Contrary to the Euro Bondholders' suggestion, that plaintiffs have waited many years finally to prevail in this case does not at all suggest that additional delay is harmless.[9]

In any event, the expectation of payment flies in the face of 13 years of experience, endless litigation, and repeated public statements by Argentine officials—including countless *ad hominem* attacks by high Argentine officials over the past several weeks. Moreover, once the stay expires, Argentina could obey the Injunctions (assuming they are still worth anything) by refusing to pay either the plaintiffs or the Exchange Bondholders. In other words, the plaintiffs can never be restored to the same position they would occupy in the absence of a stay: Without a stay, Argentina must decide—*now*—whether to make a ratable payment to the plaintiffs or to default on the Exchange Bonds. If the stay continues, by contrast, Argentina will be allowed to commit additional violations during the stay and *then* can simply decide to default on the Exchange Bonds without compensating the plaintiffs. That is the very definition of irreparable injury.

Adding insult to irreparable injury, Argentina would send out vast Exchange Bond payments—including payments not in any way necessary to avoid imminent default—during the pendency of the stay. As explained above, while the stay was in place pending Argentina's

---

[9] The Euro Bondholders place great weight on *Reading & Bates Petroleum Co. v. Musslewhite*, 14 F.3d 271 (5th Cir. 1994), for the proposition a stay "c[an] not possibly have caused 'substantial harm' to [plaintiff], in light of the fact that [the] controversy . . . ha[d] been going on for more than ten years." Mot. 7. But *Reading* involved a stay *pending appeal*. 14 F.3d at 272. As the Euro Bondholders have taken no appeal and, indeed, lack standing to prosecute one in this case, *Reading* is irrelevant here.

appeals, Argentina made approximately $5.9 billion of payments on the Exchange Bonds while paying plaintiffs nothing.  That is grievously unequal.  If this Court further stays the Injunctions, Argentina is poised to add approximately another $1.6 billion to that tally; indeed, Argentina has prepared to make all of those payments at once the minute this Court or any other lifts the stay even momentarily, further undermining the plaintiffs' right to equal treatment.

### D. Indulging Any Litigant That Repeatedly Has Flouted The Court's Authority Is Not In The Public Interest

Argentina's relentless contempt for any court ruling with which it disagrees stands in the way of the Euro Bondholders' request for a stay on its behalf.  "A request for a stay is," fundamentally, "an appeal to equity."  *Ofosu v. McElroy*, 98 F.3d 694, 699 (2d Cir. 1996).  Whatever the equities might be were Argentina willing to comply with court orders, "they are changed by [its] non-cooperation with a system from which [it] demands elaborate procedural deference."  *Id.*   The law "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief."  *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 129 (2d Cir. 2009) (quotation marks omitted).

Argentina bears all the badges of bad faith that the Second Circuit has recognized.  It has "flat-out refus[ed] to comply with the District Court's lawful orders" (*id.* at 128) by initiating an Exchange Bond payment without paying the plaintiffs.  It has "time and again deployed [its] lawyers to raise legal roadblocks to the enforcement of the judgment against [it]" (*id.* at 127) through countless skirmishes in this Court and two rounds of appeals through the Second Circuit and the Supreme Court.  It has "persistently endeavored to evade the lawful jurisdiction of the District Court and undermine its careful and determined work" (*ibid.*) by planning to make Exchange Bond payments in Argentina.

16

But that is not all—Argentina has gone a step further.  As noted above, it has twice made bald-faced lies to the courts in an effort to get its way.  First, it "confirm[ed] that [it] . . . will comply" with the anti-evasion condition on the stay order, only to then announce an evasion plan when the Second Circuit ruled against it.  Second, it promised the Supreme Court—"[t]o be clear," Argentina intoned—that it would "comply with the orders under review."  The emptiness of that promise was exposed just three weeks later when, within 24 hours of the Supreme Court's order denying certiorari, President Kirchner and Minister Kicillof delivered national addresses vowing defiance and announcing an unlawful plan to evade the Injunctions.  And, as noted above, Argentina then attempted to make the very interest payment that the Injunctions explicitly prohibited.  There can be no clearer sign of Argentina's intent to evade this Court's directives.

The context of this case makes even more clear why a stay is not in the public interest. Argentina submitted to the law and jurisdiction of New York so that more investors would lend it more money at lower rates than they otherwise would.  So investors lent the money precisely because they knew that courts here would "protect their rights."  *Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 153 (2d Cir. 1991), aff'd, 504 U.S. 607 (1992).  The Second Circuit long has recognized that a foreign "government's unilateral attempt to repudiate private, commercial obligations is inconsistent with the orderly resolution of international debt problems. It is similarly contrary to the interests of the United States."  *Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 522 (2d Cir. 1985).  Letting Argentina continue to ride roughshod over the acknowledged rights of its creditors would frustrate both the rule of law generally and the specific "interest in maintaining New York's status as one of the foremost commercial centers in the world."  *Id.* at 521.

17

Despite persistently thumbing its nose at court orders, Argentina has "the chutzpah to seek post-judgment, equitable relief from complying with those orders." *Motorola*, 561 F.3d at 128.  But its "utter disregard for the District Court's orders" clearly "preclude[] the relief that [it is] seeking." *Id.* at 129.  Argentina "must take the bitter with the sweet:  [It] cannot ask [the Court] to overturn adverse judgments while insulating [itself] from the consequences of an unfavorable result." *Antonio-Martinez v. INS*, 317 F.3d 1089, 1093 (9th Cir. 2003).  Equity and the public interest demand that Argentina's final attempted abuse of the courts must come to an end.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the Euro Bondholders' Emergency Motion for Stay.

Dated: New York, New York
        July 30, 2014

Respectfully submitted,

*Edward A. Friedman / EJr*

Edward A. Friedman (efriedman@fklaw.com)
Daniel B. Rapport (drapport@fklaw.com)
FRIEDMAN KAPLAN SEILER
     & ADELMAN LLP
7 Times Square
New York, New York 10036-6516
(212) 833-1100

*Attorneys for Plaintiffs Aurelius Capital Master, Ltd.,
Aurelius Opportunities Fund II, LLC, ACP Master,
Ltd., Blue Angel Capital I LLC*

Robert A. Cohen
(robert.cohen@dechert.com)
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036-6796
(212) 698-3500

*Attorneys for Plaintiff NML Capital, Ltd.*

Michael C. Spencer
(MSpencer@milberg.com)
MILBERG LLP
One Pennsylvania Plaza
New York, New York 10119
(212) 594-5300

*Attorneys for Plaintiffs Pablo Alberto Varela, et al.*

Leonard F. Lesser
(llesser@simonlesser.com)
SIMON LESSER PC
355 Lexington Avenue, 10th Floor
New York, New York 10017
(212) 599-5455

*Attorneys for Plaintiff Olifant Fund, Ltd.*